1
2
3
4
5
6        IN THE UNITED STATES DISTRICT COURT

7        FOR THE DISTRICT OF ARIZONA

8

9   United States of America,            )
                                          )
10              Plaintiff,                )        CR-09-0017-TUC-DCB (JCG)
                                          )
11  vs.                                   )
                                          )        **REPORT &**
12                                        )        **RECOMMENDATION**
                                          )
    Pauline Gallego Hong,                 )
13                                        )
                Defendant.                )
14                                        )
    _____)
15

16        Defendant, Pauline Gallego Hong, has filed a Motion to Suppress Physical Evidence

17  and Statements based on the Fourth and Fifth Amendments of the United States Constitution.

18  Pending before the Court are the Defendant's Motion to Suppress ("Motion") (Doc. No. 16),

19  the United States' Opposition to Defense Motion ("Response") (Doc. No. 23), Defendant's

20  Reply to the Government's Opposition ("Reply") (Doc. No. 24), and the United States'

21  Supplemental Opposition to Defense Motion ("Supplemental") (Doc. No. 25).

22        This matter was set for evidentiary hearing and evidence was heard on April 8, 2009

23  and April 20, 2009.  Defendant Pauline Gallego Hong was present and represented by

24  counsel.  This matter was submitted following oral argument at the conclusion of the hearing

25  and was taken under advisement.

26        Having now considered the matter, the Magistrate Judge recommends that the District

27  Court, after its independent review, deny Defendant's Motion to Suppress.

28

1

### FACTUAL FINDINGS

2    U.S. Border Patrol Agents William Thornbloom, Eric Terry, and Kevin Reilly were

3  all engaged in highway operations on the morning of December 8, 2008, and each testified

4  at the hearing on Defendant's Motion to Suppress.  During Agent Thornbloom's testimony,

5  the government presented radio transmissions of the agents' communications on December

6  8, 2008, which Agent Thornbloom interpreted and explained as part of his testimony.  The

7  agents testified as follows:

8    On the morning of December 8, 2008, at approximately 5 a.m., U.S. Border Patrol

9  officials closed the temporary immigration checkpoint on Interstate 19 at kilometer post 42,

10 near Amado, Arizona, due to rain.  As is typical, the agents who were assigned to work at the

11 checkpoint that morning were reassigned to "highway operations," patrolling the area in their

12 vehicles.  According to the Border Patrol agents, when the checkpoint is closed, illegal

13 activity increases because "scouts" communicate with smugglers to inform them of the

14 closure; the closure makes it easier to avoid law enforcement detection of illegal loads.  As

15 a result, the agents were on high alert for suspicious activity that morning.

16   Agent Thornbloom[1] was parked in the median on Interstate 19, several kilometers

17 south of the checkpoint, in an unmarked pick-up truck with light bars on the inside

18 windshield.  Agent Thornbloom was facing east and observing northbound traffic.  At

19 approximately 6:40 a.m., Agent Thornbloom noticed a Jeep Laredo drive by with a Chevrolet

20 Tahoe driving less than a car length behind it.  Agent Thornbloom had his headlights on and

21 could see the faces of the drivers as they approached and passed him.  Agent Thornbloom

22 found it suspicious that the two vehicles were driving so closely because in his experience,

23 tandem driving is a method of driving used by narcotics and alien smugglers to throw off law

24 enforcement agents.  Agent Thornbloom also found it suspicious that neither of the drivers

25 looked at him as they passed.  He could see the face of the driver of the Laredo clearly.  He

26

27

28

---

[1]Agent Thornbloom has 3 ½ years experience with the Border Patrol.  He has spent
75% of that time assigned to checkpoint duties.

1    also noticed that the driver was gripping the steering wheel, sitting very rigid - straight up.

2    He could not see clearly into the Tahoe because the windows on the side were tinted, but he

3    could see the silhouette of the driver.  According to Agent Thornbloom, he has an unmarked

4    white pickup truck and usually when he parks in the median, people look over to see who it

5    is or what's going on in the median. The fact that neither driver did raised his suspicion.

6    Consequently, at 6:42 a.m., he pulled out of the median, caught up to the vehicles, and

7    requested registration checks.  The registration checks revealed that the Tahoe belonged to

8    Defendant Pauline Gallego Hong with a Tucson address, and that the Laredo belonged to

9    Mireya Valdez-Blanco with a Rio Rico address.

10          Agent Thornbloom passed the Tahoe and pulled next to the Laredo in an attempt to

11   look inside.  The Tahoe then slowed down.  The driver of the Laredo was a large man sitting

12   close to the steering wheel as though his seat was pushed all the way forward.  The driver did

13   not look at Agent Thornbloom even though Agent Thornbloom was driving beside him,

14   "pacing him," for approximately two minutes.  Agent Thornbloom testified that the sun had

15   not yet risen over the mountains, but there was ambient, pre-dawn light by which he could

16   see into the vehicle.[2]  Agent Thornbloom also testified that because he was driving on the

17   west side of the Laredo, he could see the silhouette of the vehicle's contents as the pre-dawn

18   sunlight shone through the vehicle's tinted windows. He observed what appeared to be large,

19   square objects beneath blankets in the backseat.   It appeared that the seats had been folded

20   down; the square bundles stretched from behind the driver's seat all the way to the rear of

21   the vehicle. This observation made Agent Thornbloom suspicious because in his experience,

22   the only time large square objects were covered with blankets was in narcotics smuggling.

23   Agent Thornbloom reported his suspicions to dispatch and other agents were called in to

24   assist him.

25   _____

26          [2] The Government's Response indicated that Agent Thornbloom used alley lights on
     the cab of his truck to see inside the Laredo.  The Supplemental, however, explains that this
27   was an error based on a mistaken reading of the Government's interview notes.  Agent
     Thornbloom did not use a light in making his observations.
28

1      Agent Thornbloom activated his lights and initiated a stop of the Laredo.  As he was

2   stopping the Laredo, he could see police lights behind him and knew that other agents were

3   stopping the Tahoe.  The driver of the Laredo pulled onto the shoulder, but as Agent

4   Thornbloom opened his truck door to get out, the Laredo started to drive forward again.

5   Agent Thornbloom got back into his truck and followed the Laredo as it drove up the

6   shoulder in the emergency lane an additional two to three kilometers.  Agent Thornbloom

7   testified that, based on his experience, he anticipated that the driver might be intending to

8   pull far enough ahead of the patrol car so he could "bail out" and get away.  As the vehicle

9   drove in the emergency lane, Agent Thornbloom radioed that the vehicle was "good for

10  something."   The Laredo finally came to a stop and Agent Thornbloom and the driver

11  interacted.[3]  At 6:48, Thornbloom radioed that the Laredo was "positive for narcotics."

12      On that same morning, Agents Terry and Reilly[4] were together in a marked pick-up

13  truck with overhead lights on top of the cab. At approximately 6:45 a.m., they heard the radio

14  report from Agent Thornbloom regarding the Laredo and the Tahoe driving in tandem.

15  When the Laredo and Tahoe passed their location, followed by Agent Thornbloom, they

16  pulled out to assist.  The agents heard Agent Thornbloom obtain registration information on

17  the vehicles.  Agent Terry thought it was odd that the Tahoe was from Tucson because most

18  people are traveling away from home towards work at that time of day on I–19; the Tahoe

19  was traveling towards Tucson. Over the radio, Thornbloom said he was going to check out

20  the first vehicle and asked if Terry and Reilly could take a look at the second.

21      Agents Terry and Reilly observed the Tahoe reduce its speed after Agent Thornbloom

22  passed it.  The agents then pulled up beside the Tahoe to further inspect it.  Agent Terry

23

24      [3]Agent Thornbloom testified regarding the driver's actions and the search of the Jeep

25  Laredo; however, as these occurrences were not transmitted to Agents Terry and Reilly, the

26  facts could not have been a basis for the stop of the Tahoe and therefore are not recounted

    here.

27      [4]Agent Terry has been employed by the Border Patrol for 2 ½ years; Agent Reilly for

28  1 year and three months.

- 4 -

could see that there was something in the back of the Tahoe, but could not tell what it was. Agent Terry turned on the alley lights of his vehicle.[5]   Agent Reilly also rolled down the passenger window and pointed a high intensity flashlight along the driver's side of the Tahoe.   Agent Reilly was hanging "pretty far" out of the passenger side window, maybe waist high, shining the flashlight in the back cargo area of the Tahoe which was approximately four feet away.   Though the windows of the vehicle were heavily tinted, Agents Terry and Reilly could see big square objects covered by blankets in the backseat and rear cargo area.   In the back seat, the squares sat approximately three inches above the window.   In the cargo area, the squares were flush with the window.   Agent Reilly told Agent Terry "it looked good," meaning positive for narcotics.   The agents also noticed Defendant gripping the steering wheel tightly and staring straight ahead, despite their presence and the lights directed toward the vehicle.   The agents thought the driver's reaction was odd given that they were in a marked unit, riding along side and shining a light into the vehicle.   According to Agent Terry, he had done this before and "most people at least look over to see what we're doing."   The agents both testified that, based on their experience, a covered load in the back of a vehicle is a sign that the vehicle is transporting illegal cargo.

Agents Terry and Reilly initiated a stop of the Tahoe.   As they were pulling the Tahoe over, Agent Terry observed Agent Thornbloom pulling over the Laredo.   Agent Terry saw the Laredo pull onto the shoulder, stop, and then start to drive up the shoulder.   When the Laredo started to drive up the shoulder, Agent Terry testified that the Tahoe swerved as though it was not going to pull over.   The Tahoe then swerved back the shoulder and stopped but did not appear to be in "park."   Agent Reilly heard over the radio the Laredo was a possible failure to yield.   Agent Terry remained in the vehicle and told Agent Reilly to get out of the vehicle and "verify it's a load."   Agent Terry testified that he was suspicious that the Tahoe would try to drive away once Agent Reilly got out of the patrol car.   Agent Reilly

---

[5] Alley lights are spotlights that are connected to the overhead lights on the top of the cab; they point outward, as opposed to the front or back of a vehicle.

1    testified that he was concerned that if the first vehicle failed to yield and the two vehicles

2    were linked, the Tahoe might do the same.  Both Agents Terry and Reilly testified that, based

3    on their experience, they were suspicious that Defendant might try to evade the agents long

4    enough for occupants to bail out.  Once Agent Reilly approached the Tahoe, he could see

5    through the passenger's window, black-bagged bundles of what appeared to be marijuana

6    inside the cargo area, covered in a blanket. The bundles were stacked on top of each other

7    and when he came up on the side, he was able to see the bundles underneath the blanket.  The

8    blankets covered the top of the bundles.

9         Agent Reilly told the Defendant to get out of her vehicle.  Agent Terry then got out

10   of his vehicle and approached Defendant.  When Agent Terry asked Defendant if they could

11   look in the back of her vehicle,  the Defendant stated that she had just picked it up from her

12   aunt's.  Agent Terry said that it was apparent that the vehicle was loaded with narcotics, so

13   he asked her again if they could search the vehicle.  She did not respond.  Agent Terry then

14   heard Agent Thornbloom on his radio, reporting that the Laredo contained narcotics.  Agent

15   Terry requested a K9 unit to inspect the Tahoe.  According to the radio recordings, at 6:51

16   a.m., Agent Uribe arrived with a K9.  The dog alerted to the vehicle.  At 6:52 a.m., radio

17   transmissions include Agent Terry stating that drugs were found.  According to Agent Terry,

18   after the doors of the Tahoe were opened, he observed black-bagged bundles in the vehicle,

19   under the blankets.

20        The bundles were later determined to be marijuana.  Both the bundles and the Tahoe

21   were seized, and Defendant was taken into custody and later made inculpatory statements.

22        Defendant also testified at the hearing.  Her testimony differed significantly from that

23   of the agents as to the time, the conditions, the order of events, and what happened.

24   Defendant testified that she was stopped at approximately 6:15 a.m.  She described the

25   weather conditions as "pouring rain, a lot of fog, windy, really black, no lighting."

26   According to Defendant, Agents Thornbloom, Terry and Reilly were all traveling in

27   unmarked Border Patrol vehicles.  Defendant testified that it was raining so hard she could

28   not see the lines on the highway.  She also testified that she looked into both Border Patrol

- 6 -

1   vehicles as she passed them and that the agents did not use any artificial lighting to see into

2   her car.  According to Defendant, she was transporting only six bundles of marijuana in her

3   vehicle and they were all stacked on the floor of the cargo area, well below the window line.

4   The bundles were approximately two feet wide and 1 ½ feet high.  Defendant claimed the

5   bundles were not stacked on top of each other.  She did not cover the bundles with blankets

6   because they were wrapped in black plastic, it was raining and they could not been seen

7   through the tinted windows. Defendant further testified that she pulled over immediately

8   once Border Patrol activated its lights and that the agents searched her vehicle before an

9   officer with a narcotics dog arrived on the scene.  Defendant testified that agents did not ask

10  her for consent to search the vehicle.  An agent walked her to the back of the truck and

11  another agent opened the back door on the passenger side.  Defendant admitted that Agent

12  Reilley told her that she was going to be under arrest before any agent opened the Tahoe or

13  went inside the vehicle.  Defendant also admitted that she had been convicted of a felony in

14  1999.

15      DEA Agent Chad Jenkins was called by Defendant to testify regarding the marijuana

16  discovered in Defendant's vehicle.   He testified that he took pictures of the marijuana that

17  Border Patrol agents told him they found in Defendant's vehicle.  Photographs admitted

18  during Agent Jenkins' testimony showed 19 bundles wrapped in black plastic.[6]

19      Araceli Serrano testified during the government's rebuttal.  Ms. Serrano is employed

20  as the forfeiture clerk for the Santa Cruz County Attorney's Office. Ms. Serrano recalled that

21  Defendant's vehicle had sheets in it when she picked it up from DEA: one in the back seat,

22  one in the cargo area.  Ms. Serrano's testimony was supported by photographs that she took

23  of the vehicle's interior.   Ms. Serrano also testified that other items were observed in

24

25

---

26      [6]The government did not provide testimony showing that the 19 bundles of marijuana
    received by Agent Jenkins were  the bundles seized from the Defendant's vehicle.  Because
27  there was insufficient chain of custody evidence, the pictures and Agent Jenkins' testimony
28  were not considered in reaching the recommendations in this report.

1  Defendant's car, including a coat, two pillows and some loose change.   Defendant testified

2  that the sheets shown in the pictures were not hers and were not in her vehicle.

3  **ANALYSIS**

4  Defendant contends that Agents Terry and Reilly stopped the Defendant's vehicle

5  without reasonable suspicion, in violation of the Defendant's Fourth Amendment rights, and

6  that Defendant's statements made following her arrest were the result of an illegal stop.

7  Accordingly, Defendant asserts that both the marijuana and the statements must be

8  suppressed.

9  **I.   Suppression of the Marijuana**

10  The Fourth Amendment prohibits "unreasonable searches and seizures" by the

11  Government.   When this constitutional right is violated, the exclusionary rule bars the use

12  of seized evidence at trial. *See Weeks v. United States*, 232 U.S. 383, 393-94 (1914); *Mapp*

13  *v. Ohio*, 367 U.S. 643, 654 (1961).    The Fourth Amendment's prohibition against

14  unreasonable searches and seizures extends to brief, investigatory stops of persons or

15  vehicles that fall short of traditional arrests. *See Terry v. Ohio*, 392 U.S. 1, 9 (1968).  A stop

16  is justified under the Fourth Amendment if the officer's action is supported by reasonable

17  suspicion to believe that the person stopped is, or is about to be, engaged in criminal activity.

18  *See United States v. Arvizu,* 534 U.S. 266, 273 (2002).   In making a reasonable suspicion

19  determination, the Court looks to the totality of the circumstances to evaluate whether the

20  detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing.

21  *Id.*   Reasonable suspicion can be based on the officer's own experience and specialized

22  training. *Id.*  In fact, officers may make inferences from and deductions about the cumulative

23  information available to them that "might well elude an untrained person." *Id.*

24  Any number of factors may be taken into account in deciding whether there is

25  reasonable suspicion to stop a car in the border area. *See United States v. Brignoni-Ponce*,

26  422 U.S. 873, 884-85 (1975).  Officers may consider the characteristics of the area in which

27  they encounter a vehicle: its proximity to the border, the usual patterns of traffic on the

28  particular road, and the officer's previous experience with alien traffic.  *Id.* (citations

1  omitted).  In addition, the driver's behavior may be relevant, as erratic driving or obvious

2  attempts to evade officers can support a finding of reasonable suspicion.  *Id.* at 885 (citations

3  omitted).  Aspects of the vehicle itself may also justify suspicion.  *Id.*  For instance, officers

4  say that certain station wagons, with large compartments for fold-down seats or spare tires,

5  are frequently used for transporting concealed aliens.  *Id.* (citing *United States v.*

6  *Bugarin-Casas*, 484 F.2d 853 (9th Cir. 1973); *United States v. Wright*, 476 F.2d 1027 (5th

7  Cir. 1973)).  The vehicle may appear to be heavily loaded, it may have an extraordinary

8  number of passengers, or the officers may observe persons trying to hide.  *Id.*  In all

9  situations, officers are entitled to assess the facts in light of their own experience.  *Id.* (citing

10  *Terry*, 392 U.S. at 27).

11      The Court finds that the agents credibly testified regarding Defendant's stop and

12  arrest.  The testimony of each agent was consistent with the testimony of the other agents,

13  and the testimony was consistent with radio transmissions made during the stop on December

14  8, 2008.[7]   Agents Terry and Reilly testified that Defendant's vehicle contained square

15  bundles of marijuana wrapped in black plastic; Defendant admitted that she was transporting

16  bundles of marijuana wrapped in black plastic.  The agents were each forthcoming about the

17

18      [7] Defendant challenged the agents' credibility on the grounds that the agents failed to

19  include certain important details in their reports, including the fact of tandem driving of the

20  vehicles, the use of a flashlight and alley lights, and the failure to photograph the marijuana
    in place in the Tahoe. Despite these omissions, the Court finds the agents credible. Although

21  the agents could have, and perhaps should have, prepared more complete reports, and
    photographed the marijuana in the vehicle, the fact that the reports failed to mention certain

22  details does not suggest that the agents have falsely testified regarding those details. As
    previously stated, the agents' offered consistent testimony. Agents Thornbloom and Terry,

23  who prepared reports in this case, both admitted that they were fatigued when they prepared
    their reports and did not provide as complete a description as they should have, thereby

24  offering a credible and reasonable explanation for the reports' lack of details.  In addition,
    each is a relatively new agent. Furthermore, the radio transmissions admitted into evidence

25  included Agent Thornbloom's real-time description of the tandem driving. Finally, the
    government produced evidence demonstrating that Agent Reilly was assigned an

26  experimental high-beam flashlight at the time of Defendants' arrest, which supports his

27  testimony that he used this flashlight to look into Defendant's vehicle.

28

limitations of their perception of the Defendant's vehicle: each agent testified that he could see through the window into the cargo area well enough to observe blankets covering what appeared to be bundles of marijuana.

Based on the credible testimony of the agents, the Court concludes that the agents' stop of Defendant's vehicle was supported by reasonable suspicion. First, the incident occurred close to the Mexico border on Interstate 19, a route commonly used for alien and drug trafficking. *See United States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000) (holding that characteristics of suspected smugglers road on which investigatory stop of vehicle occurred justified reliance on area as factor giving rise to reasonable suspicion for stop, including roads, proximity to border, tracks which indicated that road had been used as smugglers rendezvous, and intelligence information indicating that road was used as rendezvous). The agents knew the permanent checkpoint was closed and, based on their experience, expected that illegal activity would increase. Defendant also appeared to be driving in tandem with the Laredo. *See United States v. Larios-Montes*, 500 F.2d 941, 943-44 (9th Cir. 1974) (driving in tandem is a factor to be considered in the reasonable suspicion analysis); *but see United States v. Munoz*, 604 F.2d 1160,1161 (9th Cir. 1979) (driving in tandem and failing to look at nearby Border Patrol agents alone is not enough for reasonable suspicion). In addition, Defendant's behavior was suspicious: Defendant did not look at Agent Thornbloom when she first drove past him, Defendant slowed down when Agent Thornbloom passed her, and Defendant was gripping the steering wheel tightly and staring straight ahead when Agents Terry and Reilly were driving next to her and shining bright lights at her vehicle. When Agents Terry and Reilly actually looked into Defendant's vehicle with the assistance of multiple lights, they observed square bundles covered with blankets. In their experience, drug smugglers often conceal their loads with blankets.[8]  Finally, when

---

[8] Defendant argued that the agents were not entitled to assume, based on what they could observe, that the blankets were covering marijuana bundles. The Court disagrees. Each agent testified that, in his experience as a law enforcement officer, drug smugglers conceal their loads with blankets. In fact, the Court has difficult conceiving of a reason why

1  Agents Terry and Reilly attempted to stop Defendant, she swerved toward and away from
2  the shoulder, causing the agents to suspect that she might be attempting to evade the agents
3  long enough for occupants of the vehicle to bail out.  The agents were also aware that the
4  Laredo, which they believed was associated with the Tahoe, was similarly failing to yield to
5  Agent Thornbloom.

6          The Court finds that Defendant failed to offer credible testimony regarding the stop
7  of her vehicle.  Defendant's testimony was directly contradicted by the testimony of the
8  agents and the radio transmissions from the morning of December 8, 2008.  Defendant
9  testified that she was stopped sometime between 6:14 a.m. and 6:20 a.m.; Agent
10 Thornbloom's testimony and the time-stamp on the radio transmissions indicate that Agent
11 Thornbloom first observed Defendant driving past his vehicle at approximately 6:42 a.m.
12 Defendant testified that the marijuana could not be seen in her vehicle prior to the stop;
13 Agents Terry and Reilly both testified that they could see the bundles under blankets as they
14 passed her vehicle.  In addition, Defendant testified that the bundles were not covered with
15 blankets, but the government produced evidence that sheets were discovered in the back of
16 Defendant's vehicle following her arrest.  Finally, Defendant testified that, after she was
17 stopped but before the agents looked into her vehicle, the agents told her she was going to
18 be arrested.  This testimony supports the agents' testimony that they could see bundles under
19 blankets as they drove alongside Defendant's vehicle before initiating the stop.

20         The factors articulated by all three Border Patrol agents, when taken together, form
21 a particularized and objective basis for stopping the Defendant's vehicle.  Accordingly, the
22 marijuana seized from the vehicle should not be suppressed under the exclusionary rule.

23

24 **II.     Suppression of the Defendant's Statements**

25

26 _____

27 a legal load would be covered.  The agents also observed the shapes under the blankets
   looked like rectangular bundles, a shape that the agents knew to be typical for marijuana
28 loads.

1    Under the fruit-of-the-poisonous-tree doctrine, the exclusionary rule extends not only

2 to direct violations by the Government, but also to secondary evidence obtained because of

3 the violation.  *See Silverthorn Lumber Co. v. United States*, 251 U.S. 385, 392 (1920); *see*

4 *also Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).  Here, Defendant argues that

5 since there was no reasonable suspicion for the initial stop, there was a direct Fourth

6 Amendment violation and Defendant's subsequent statements must be suppressed as fruit of

7 the poisonous tree.  However, as discussed above, the Border Patrol agents had a

8 particularized and objective basis for stopping the Defendant's vehicle.  As such, there was

9 no Government violation requiring suppression of the statements.

10    Accordingly, the Defendant's statements made following her arrest should not be

11 suppressed under the exclusionary rule.

12                                   **RECOMMENDATION**

13    In view of the foregoing, it is recommended that, after its independent review of the

14 record, the District Court DENY Defendant's Motion to Suppress filed on February 17, 2009.

15 (Doc. No. 16.) The parties have ten (10) days to serve and file written objections to the

16 Report and Recommendation.  The parties are advised that any objections should be filed

17 with the following caption: **CR-09-0017-TUC-DCB.**

18    DATED this 29th day of April, 2009.

19

20

21

22    _____

23                    Jennifer C. Guerin
                United States Magistrate Judge

24

25

26

27

28